UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KEVIN GRANT,
    Plaintiff,

v.     Civil Action No. 15-cv-12972-ADB

TARGET CORPORATION,
    Defendant.

**MEMORANDUM AND ORDER GRANTING
SUMMARY JUDGMENT FOR DEFENDANT**

BURROUGHS, D.J.

On June 16, 2015, Plaintiff Kevin Grant ("Grant") sued his former employer, Target Corporation ("Target") in state court, alleging that Target wrongfully terminated his employment in April 2015. In July 2015, Target removed the case to federal district court pursuant to 28 U.S.C. § 1332. [ECF No. 1]. Presently before this Court is Target's Motion for Summary Judgment [ECF No. 34]. For the reasons set forth below, Target's motion is **GRANTED**.

## I. PROCEDURAL BACKGROUND

Grant initially filed his complaint in Essex County Superior Court, seeking damages for breach of contract (Count I), violation of the covenant of good faith and fair dealing (Count II), wrongful termination in violation of public policy (Count III), misrepresentation (Count IV), and defamation (Count V). [ECF No. 8]. On July 28, 2015, after removing the case, Target filed a motion to dismiss all counts for failure to state a claim. [ECF Nos. 1, 6]. On September 3, 2015, this Court dismissed Counts II, III, and IV with prejudice, and dismissed Count V without prejudice. [ECF No. 15]. On September 23, 2015, Grant amended his complaint to state two claims: breach of contract (Count I) and defamation (Count II). [ECF No. 17]. Grant now

1

voluntarily agrees to dismiss his defamation claim (Count II). [ECF No. 39 at 1 n.1]. Accordingly, the Court will only address Target's summary judgment motion with respect to the breach of contract claim (Count I).

## II. FACTUAL BACKGROUND

The following facts are drawn from the statements of undisputed material facts and responses [ECF Nos. 36, 40, 44], unless otherwise noted. See D. Mass., Local Rule 56.1. Where the facts are disputed, the Court views the record in the light most favorable to Grant, the non-moving party. See Mariasch v. Gillette Co., 521 F.3d 68, 70 (1st Cir. 2008).

From November 2014 to April 28, 2015, Grant was employed by Target as a "Store Team Leader," which is the highest level of management at a Target store. Target is an at-will employer, but Grant claims that he did not understand the significance of being an "employee at-will." [ECF No. 40 ¶ 2].

### A. "Counseling & Corrective Action" Policy[1]

Target has a "Counseling & Corrective Action" policy ("the Policy") available to Human Resources and Management personnel that provides guidelines[2] for disciplinary or corrective action for team members with performance issues. Grant did not sign the Policy, manifest assent to its provisions as a condition of his employment, or negotiate over its terms. [ECF No. 40 ¶ 15]. Grant first saw the Policy after he was hired, during his training. Id. It explicitly and immediately states in the opening section, under the caption "POLICY:"

---

[1] Grant also had access to a Team Member Handbook, but only argues on summary judgment that the Counseling & Corrective Action Policy created an implied contract.
[2] Grant disputes the characterization of the Policy as "guidelines" because he believes that the Policy was binding on Target. The Court notes, however, that the Policy explicitly states in the opening sentence that it "establishes broad guidelines." The Court will therefore refer to sections within the Policy as guidelines where the Policy explicitly so states, but will refer to it more generally as "the Policy."

2

> This policy establishes broad guidelines designed to achieve fair and equitable treatment for all team members. *It does not, either by itself or in conjunction with any other company documents, policy, practice, procedure or verbal statement, create an employment contract, express or implied, or define the employment relationship or limit how that relationship may end.* Team members are employed at will, meaning they or the company can end the employment relationship anytime, for any reason. This policy does not alter the at will status of any team member. . . .
>
> As a guideline, this policy is not all-inclusive. Rather, it is intended to outline unacceptable team member conduct during employment and establish recommended procedures for dealing with team member conduct or work performance that does not meet Company standards. This policy may change from time to time as business needs dictate with or without advance notice to those affected, and Target Corporation reserves the right to depart from these guidelines when it is deemed appropriate.

[ECF No. 40 ¶ 16]; [ECF No. 36-13] (emphasis in original). The Policy further states that the "Corrective Action Guidelines Summary is intended as a reference tool, and not as an all-inclusive list of infractions." Id. ¶ 18. It specifies, for example, that one form of "Gross Misconduct" is "Detrimental Behavior," and the listing suggests that the typical response is termination. The Policy states throughout that these are "guidelines" and "recommended procedures," and are not all-inclusive. See, e.g., [ECF No. 36-13 at 1, 2, 3, 4, 5, 9, 19, 20].

### B. Grant's Termination

In March 2015, Grant was temporarily designated the Store Team Leader of the Target store in Haverhill, Massachusetts. [ECF No. 40 ¶ 20]. He oversaw three levels of employees: executive team leaders ("ETL"), team leaders, and team members. Id. ¶ 22. Grant had four ETLs reporting directly to him, one of whom was the ETL of Human Resources. Id. ¶¶ 22–23. During his time as Store Team Leader, Grant reported directly to Andrew Chiarelli, the District Team Leader, who oversaw the teams and operations for eleven Target stores. Id. ¶ 26.

On April 18, 2015, Grant responded to an alarm call in the early morning hours at the Target store in Haverhill, Massachusetts. On and shortly after April 23, 2015, Grant had conversations with his staff members, Andrew Chiarelli, and other Human Resources employees

3

regarding his response to the alarm call a few days earlier, the facts of which are not material to the outcome of this Memorandum and Order. Shortly thereafter, on April 28, 2015, Grant was terminated from his position as Store Team Leader at Target for "Detrimental Behavior."[3] [ECF No. 36-9].

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if, viewing the record in a light most favorable to the non-moving party, the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Id. at 6 (citation omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. "To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the movant takes the position that the record

---

[3] The parties dispute the factual reasons for Grant's termination. Grant believed that he was terminated for his response to an alarm that went off at the Target store after he had been drinking, but Target contends that Grant was terminated for various statements that he made to his employees and co-workers after the response to the alarm that impeded his ability to lead the team moving forward. [ECF No. 40 ¶ 65, 66, 68, 69]. The reasons that Grant was terminated are not dispositive of his claim for breach of contract because the Court concludes that the facts do not support finding the existence of a contract, as discussed more fully below; therefore, it is not necessary to address the reasons for Grant's termination here.

4

fails to make out any question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. North Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013) (citation omitted). "[T]he nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingram v. Brink's, Inc., 414 F.3d 222, 228–29 (1st Cir. 2005).

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In reviewing the record, however, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). At summary judgment, "the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Burns v. Johnson, No. 15-1982, 2016 WL 3675157, at *4 (1st Cir. July 11, 2016) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)) (alteration in original). "Summary judgment for the defendant [] is appropriate when the evidence is so one-sided that no reasonable person could find in favor of the plaintiff." Vega-Colon v. Wyeth Pharm., 625 F.3d 22, 25 (1st Cir. 2010) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 211 (1st Cir. 2003)).

**B.    Analysis**

Target argues that granting summary judgment is appropriate here because Grant has not introduced any evidence to demonstrate that Target's policies or procedures constituted an implied contract, or that Target breached any policy that amounted to a contractual term. Grant argues that he has raised issues of material fact as to whether Target's "Counseling & Corrective

5

Action" policy (the Policy) created a contractual obligation that bound Target when disciplining its employees and altered his at-will employment status.

In Massachusetts, at-will employment is assumed unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment. Derrig v. Wal-Mart Stores, Inc., 942 F. Supp. 49, 55 (D. Mass. 1996). "An employee at will . . . may be terminated by an employer, without notice, 'for almost any reason or for no reason at all.'" GTE Products Corp. v. Stewart, 653 N.E.2d 161, 165 (Mass. 1995) (quoting Jackson v. Action for Bos. Cmty. Dev., Inc., 525 N.E.2d 411, 411 (Mass. 1988)). "[O]n proper proof," however, "a personnel manual can be shown to form the basis of such an express or implied contract" that governs the terms and conditions of employment, where the parties agree that it will spell out the relative rights and obligations of employer and employee. Jackson, 525 N.E.2d at 415; see also O'Brien v. New England Tel. & Tel. Co., 664 N.E.2d 843, 847 (Mass. 1996) (discussing circumstances under which a personnel manual may give rise to a binding contract). "The interpretation of a written policy manual as to whether it establishes a contract is a legal matter for the court." Sekamate v. Newton Wellesley Hosp., No. 00-12528-DPW, 2002 WL31194873, at *13 (D. Mass. Sept. 3, 2002) (citing Derrig, 942 F. Supp. at 54).

In O'Brien, the Massachusetts Supreme Judicial Court clarified its earlier opinion in Jackson regarding the standard used to determine whether a personnel manual constitutes an implied contract. See O'Brien, 664 N.E.2d at 847. In holding that there was no contract, the Jackson court relied on the following factors: (1) whether the manual allows the employer to unilaterally amend the terms at-will; (2) whether the manual states that it provides only "guidance" as to the employer's policies; (3) whether there were any negotiations over the terms of the manual; (4) whether the manual stated a term of employment; (5) whether the employer

6

called any "special attention" to the manual; and (6) whether the employee was required to sign, assent-to, or acknowledge the manual's policies as a condition of employment. Jackson, 525 N.E.2d at 415–16. The O'Brien court clarified that these "circumstances . . . are not a rigid list of prerequisites, but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract." O'Brien, 664 N.E.2d at 847. Since O'Brien, Massachusetts courts have recognized that

> if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing.

Ferguson v. Host Int'l, Inc., 757 N.E.2d 267, 272 (Mass. App. Ct. 2001) (quoting Woolley v. Hoffmann-La Roche, Inc., 491 A.2d 1257, 1257, modified on other grounds, 499 A.2d 515 (N.J. 1985)). However, "even where a manual contains unambiguous language disclaiming the formation of any contractual obligation, the overall context may sufficiently suggest a legally enforceable contract as to overwhelm the effect of the specific disclaimer." Sekamate v. Newton Wellesley Hosp., , 2002 WL 31194873, at *13 (citing Ferguson, 757 N.E.2d at 272). The O'Brien court stated that "[w]ithout minimizing the importance of [the manual's] specific provisions, the context of the manual's preparation and distribution is . . . the most persuasive proof" regarding a manual's binding nature. O'Brien, 664 N.E.2d at 849 (quoting Woolley, 491 A.2d at 1265); see also Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 714 (Mass. 2001) ("Whether a policy that restricts an employer's ability to discipline an employee is binding on the employer turns on the 'context' of the policy's 'preparation and distribution.'" (quoting O'Brien, 664 N.E.2d at 849)).

At bottom, O'Brien and its progeny instruct courts to focus on the objective reasonableness of an employee's belief that a manual is binding, and Jackson provides factors that help guide this inquiry. See McMillan v. Mass. Soc. for Prevention of Cruelty To Animals, 140 F.3d 288, 310 (1st Cir. 1998) (explaining that Jackson factors are "mere guidelines"). Thus, "the central inquiries are: First, did the employee believe that the employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer? Second, was this belief reasonable under the circumstances?" Derrig, 942 F. Supp. at 55.

On summary judgment, this Court determines whether Grant adduced evidence sufficient to raise a dispute of material fact as to whether his belief that Target's Policy created a binding contract was objectively reasonable. See Derrig, 942 F. Supp. at 55. To rebut Target's argument that Grant has produced no evidence of any binding contract, Grant claims that he has raised a dispute of material fact as to the Policy's binding nature because (1) he thought that the Policy would be enforced consistently in all instances of alleged employee misconduct; (2) Target's disclaimers were buried in the fine print; and (3) Target purportedly relied on the Policy when terminating him. [ECF No. 39 at 1].

The Policy clearly and prominently states, in italicized font and in its immediate opening section, that it does not create a binding employment contract. See [ECF No. 36-13 at 1]. It repeats this disclaimer later in the Policy. Id. at 18. Grant has failed to identify sufficient evidence that the Policy and the relevant circumstances surrounding it created an objectively reasonable belief that it was a mutually binding agreement, despite these disclaimers. On the undisputed facts, all of the factors laid out in Jackson/O'Brien weigh in favor of finding that the Policy did not constitute a binding contract. The Policy repeated language indicating that it only

created guidelines and recommended procedures *numerous* times throughout the manual. Further, it is undisputed that Grant did not negotiate over the Policy or any of its terms before he was hired. [ECF No. 40 ¶ 15]. Moreover, the Policy states in its opening that "[t]his policy may change from time to time as business needs dictate with or without advance notice to those affected," indicating that Target maintained unilateral authority to change the Policy. There is also no evidence that Target called any "special attention" to the Policy and it plainly did not include a specified term of employment, but instead stated that Target could "end the employment relationship anytime, for any reason." [ECF No. 36-13 at 1]. Further, it is undisputed that Grant was not required to sign the Policy, acknowledge it, or otherwise manifest assent to its provisions as a condition of employment. [ECF No. 40 ¶ 15].

Even apart from the above considerations (that use the Jackson factors as a guide), Grant fails to show that any other circumstances involving the Policy's preparation or distribution would allow a trier of fact to conclude that Grant had a reasonable belief that the Policy formed a contract. Here, the Policy was not distributed to all employees, but was merely a reference tool for human resources and management personnel to use when disciplining employees. See DeCaro v. Hasbro, Inc., 542 F. Supp. 2d 141, 153 (D. Mass. 2008) ("[T]he fact that the written policies were not distributed to employees suggests that [employer] did not intend to bind itself to apply those policies consistently in all situations."). Additionally, Grant stated in his deposition that he was given the Policy only after he was hired, that he read it during an online training session for his management position, and that he "understood [he] and any other team member remained an at-will employee regardless of this policy." [ECF No. 36-1 at 104–05]. Grant has also not introduced evidence that he relied on the Policy as a condition for continuing his employment in any way. See [ECF No. 40 ¶ 15]. The facts would not allow a rational trier of

9

fact to conclude that it was reasonable to believe that the Policy constituted an employment contract.

Grant argues that there is a dispute of material fact because he believed that the Policy was mandatory and would be enforced in every situation; specifically, he alleges that he is personally aware of several instances where Target followed the Policy, including in his own termination. "The ad hoc implementation of the policy," however, "d[oes] not alter [an employee's] at-will employment status." Weber, 752 N.E.2d at 715 (holding that because there was no evidence employee assented to the discipline policy as condition of continuing employment and where it was implemented "ad hoc," it was not binding). Moreover, Grant's subjective belief regarding the Policy does not alone create a material factual dispute sufficient to avoid summary judgment. See Hinchey v. NYNEX Corp., 144 F.3d 134, 139–42 (1st Cir. 1998) (affirming grant of summary judgment for employer because, although employee believed that policy distributed only to management personnel had been followed in all instances he knew of and was therefore a "mandatory and binding procedure," it was insufficient to constitute a contract as a matter of law).

Grant specifically relies on three cases in arguing that his claim should survive summary judgment. First, he analogizes his case to Derrig, in which the court held that it was objectively reasonable for the employee to believe that the handbook contained binding obligations and rights because the inclusion of a "boilerplate disclaimer" was not sufficient to limit any contractual intent, given other circumstances such as the mandatory nature of the obligations outlined in the handbook. Derrig, 942 F. Supp. at 55–56. In the instant case, however, the Policy lacked any comparable mandatory language outlining any employee obligations or employer duties with respect to discipline. Rather, Target's Policy explicitly noted that it merely

"establishe[d] broad guidelines" and "recommended procedures" as opposed to any mandatory duties. See, e.g., Joyal v. Hasbro, Inc., 380 F.3d 14, 19 (1st Cir. 2004) (affirming grant of summary judgment for employer because the documents contained explicit disclaimers stating that they were no more than guidelines); Aisagbonhi v. Osmonics, Inc., No. CA2000299, 2000 WL 33159236, at *3 (Mass. Super. Ct. Sept. 11, 2000) (granting summary judgment for employer because the disclaimer was distinguishable from O'Brien and the manual "serve[d] merely as internal guidance"). In addition to discipline procedures, the handbook at issue in Derrig contained mandatory language with respect to attire, hours, training, and advancement. Derrig, 942 F. Supp. at 55. The Policy at issue here does not. Furthermore, the record before the Derrig court revealed no explicit disclaimers like those in the instant Policy. See id. at 55 n.16.

Grant also relies on Ferguson v. Host Int'l, Inc., 757 N.E.2d 267 (Mass App. Ct. 2001) and LeMaitre v. Massachusetts Turnpike Authority, 876 N.E.2d 888, 893–94 (Mass. App. Ct. 2007). Neither case, however, is sufficiently analogous to the instant case in terms of the prominence of the disclaimers or the manuals' preparation and distribution. In Ferguson, the court held that there was a genuine issue of material fact as to whether an employment manual constituted a binding contract because the disclaimer was buried in the fine print of the manual and "[i]t would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made." Ferguson, 757 N.E.2d at 272. The court in LeMaitre found that the promises made within the personnel manual were legally binding in part because there was no prominent disclaimer. LeMaitre, 876 N.E.2d at 893–94.

Here, unlike in Ferguson, the Policy was not distributed to all employees such that the workforce would believe that it contained certain promises by Target; rather, the Policy was stored in the Human Resources office for human resources and management personnel to

reference if disciplinary action was needed for employee misconduct. Further, Target's Policy explicitly stated that it "does not, either by itself or in conjunction with any company documents, policy, practice, procedure or verbal statement, create an employment contract, express or implied, or define the relationship or limit how that relationship may end." [ECF No. 36-13 at 1, 18]. This disclaimer is not buried in the "functional equivalent of the fine print," see Ferguson, 757 N.E.2d at 272, but was emphasized (in italics) in the very first two sentences of the Policy and then again near the end in bold and italics. Moreover, the Policy plainly stated that it included recommended disciplinary guidelines that were "not all inclusive" and were only "intended to outline unacceptable team member conduct . . . and establish recommended procedures for dealing with team member conduct or work performance that does not meet Company standards." [ECF No. 36-13 at 1, 19]. A similar disclaimer was again displayed in the Policy's appendix. Id. at 8. ("This Corrective Action Guidelines Summary is intended as a reference tool, and not as an all-inclusive list of infractions."). Another explicit disclaimer, also displayed both on the first page and in the discipline section, stated that "this policy does not alter the at-will status of any team member." Id. at 1, 18. Here, unlike in Ferguson and LeMaitre, there were sufficient disclaimers prominently displayed on the first page and throughout the Policy to alert Grant to Target's reservation of wide-ranging discretion and that the Policy was non-binding as to both the employer and the employee. See [ECF No. 36-13 at 1, 2, 3, 4, 5, 9, 18, 19, 20, 21]. Moreover, as discussed above, the circumstances surrounding the Policy did not overwhelm these disclaimers.

Accordingly, Grant has been unable to adduce sufficient evidence for a rational trier of fact to conclude that his belief that Target's Policy formed an implied contract granting him rights beyond those of an at-will employee was reasonable. Because Grant has been unable to

12

show that there could exist a binding contract on these facts, the Court need not reach the question of whether there was an alleged breach. See, e.g., Hinchey, 144 F. 3d at 142 (granting summary judgment on question of existence of contract and finding no need to determine any alleged breach); DeCaro, 542 F. Supp. 2d at 153 (granting summary judgment and noting that "[a]s Plaintiff is unable to show there was a binding agreement, his breach of contract claim necessarily fails").

## IV. CONCLUSION

For the foregoing reasons, Target's motion for summary judgment [ECF No. 34] is GRANTED, summary judgment is entered in favor of Target, and the case is hereby dismissed.

**SO ORDERED.**

Dated: June 5, 2017
/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
DISTRICT JUDGE